## Karker's Appeal.　Rex's Estate.

| 60 | 141 |
|154 | 77 |
| 60 | 141 |
|156 | 200 |
| 60 | 141 |
|161 | 434 |
| 60 | 141 |
|f203 | 7158 |

1. General rules for the construction of wills should be adapted to the particular circumstances of the case.

2. The words "*shall happen to die without issue*" generally mean an *indefinite* failure of issue and cut down a fee simple to a fee tail, but this rule has no application to instruments conferring a power to devise in fee.

3. A gift with uncontrolled power of devise carries the fee. What shall happen if the first taker die intestate is for the law to decide.

4. A testator cannot say that although his devisee has the fee and power to devise, yet if he die intestate the law shall not take its course.

5. If after devising to a son, his heirs and assigns, the testator add "In case he shall happen to die *intestate* and without issue," then over, the word "*intestate*" recognising a power of devise, destroys the ordinary effect of the words "die without issue," and leaves the fee unharmed thereby and intact.

6. The limitation over after the fee is void.

7. A devise to A. and "*in case*" of his death to B., is an absolute gift to A. unless he die in the testator's lifetime. Death generally, is not meant, but death in the lifetime of the testator.

8. If the testator blend his realty and personalty, words which would create an estate tail as to realty are to be construed as carrying a fee, for there can be no estate tail in chattels.

9. Where a testator devised to his son Joseph real estate " to hold to him, "his heirs and assigns," and bequeathed certain personal property to him, "his heirs and assigns for ever," with a limitation over as follows, viz. "In case my said son Joseph, who is now in a declining state of health, shall happen to die intestate and without issue, then and in that case, I give, &c., the estate, real and personal, willed, &c., unto him, to my son, the said William, and to his heirs and assigns for ever; subject to the payment of 150*l*. to each of my other sons, the said Jacob and John, or their respective heirs and assigns,"it was *held*,

(*a*). That Joseph took a fee simple and not a fee tail.

(*b*). That the limitation over to William was intended to provide for the death of Joseph within the lifetime of the testator, or in the lifetime of William, that it was therefore founded upon a definite failure of issue, and operated as an executory devise and not as a vested remainder, that Joseph having survived both these events, *eo instanti* the executory devise to William was defeated, and Joseph took a fee simple.

(*c*). That the power of disposition in the first taker was inconsistent with the limitation over, and the latter is to be rejected as repugnant and void. Per Brewster, J.: approved by the Supreme Court.

10. The words "shall happen to die intestate" negative the idea of an estate tail to Joseph with remainder to William.

January 6th 1869. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Appeal from the Orphans' Court for the city and county of *Philadelphia:* No. 293, to January Term 1868.

These estates came before the court below upon exceptions to the report of Thomas Cochran, Esq., auditor, which presented the question as to the proper construction to be placed upon the following clauses in the will of John Rex, Sr.:—

"I give and devise unto my son Joseph Rex all that my messuage * * to him, his *heirs and assigns*, for ever, &c.

"Item: In case my son Joseph, who is now in a declining state

[Karker's Appeal.]

of health, shall happen to *dye* intestate and without issue, then and in such case I give, bequeath and devise the estate, *real and personal*, willed, bequeathed, and devised unto ·him, to my son the said William Rex, and to his heirs and assigns for ever."

Joseph (the first taker) survived his father and his brother William. Both Joseph and William died intestate, unmarried and without issue, William having died first. His sister Sarah Karker granted all her share in his estate to her grandson. When Joseph died the grantee under this deed claimed that Joseph's estate was only an estate tail, that William had a vested remainder in Joseph's share, and that Sarah Karker's deed had not only passed her share in William's estate, but a part of *Joseph's* share.

In opposition to this it was claimed that Joseph took an absolute fee, and that William·(having died before Joseph) never had an interest in Joseph's share.

The question therefore was, whether the words above quoted gave Joseph a fee simple or a fee tail. The auditor decided in favor of the fee tail.

Exceptions were filed to his report, and the exceptions were sustained by the Orphans' Court in the following opinion :—

" BREWSTER, J.—These estates came before us upon exceptions to the auditor's report, all of which have been withdrawn save those which present the question of the proper construction to be placed upon certain devises in the last will of John Rex.

" This instrument bears date November 5th 1801. The testator died on or about February 1st 1802, leaving surviving his widow and six children. After making various provisions in his will for his family, which it is unnecessary to recite, he gives in the 14th item thereof unto his son Joseph Rex two tracts of land particularly described, ' to hold to him, his heirs and assigns for ever, subject only to the delivery of one-half of the fire-wood, and also one equal half part of the expense of keeping a cow for his said wife during her natural life, and except the water which may be spared willed unto his said son William.'

" The next item bequeaths all the residue of the personalty to his sons William and Joseph Rex, their heirs and assigns for ever. Had the will stopped at this point, the family would have been spared much litigation, and the court considerable difficulty. The devisee, Joseph Rex, was, however, at that time in ' a declining state of health ;' and, anxious to provide for the very probable contingency of his death before the decease of the testator, or at all events before the decease of the brother William, the testator added the clause which has given rise to conflicting claims before the auditor, and to learned and exhaustive arguments before the court.

" The paragraph alluded to is in these words : ' Item : *In case* my said son Joseph, who is NOW in a declining state of health,

[Karker's Appeal.]

shall HAPPEN to *dye* intestate, and without issue, then, and in that case, I give, bequeath and devise the estate, real and personal, willed, bequeathed and devised unto him, to my son the said William Rex, and to his heirs and assigns for ever, subject to the payment of 150*l.* to each of my other sons, the said Jacob and John Rex, or to their respective heirs and assigns.' The will then concluded with a clause appointing William and Jacob Rex executors, and revoking all former wills.

" The uncertainty of man's expectations was well illustrated by the results in this case. The son, whose early death was thus anticipated and provided for by the father, survived not only the testator, but his brother William. The father, as already stated, died in 1802, William Rex died in the year 1845, and Joseph Rex survived until the year 1859. As both of these sons died intestate, unmarried and without issue, it might have been that the heirs of one being the heirs of the other devisee, there would still have been no room for disputation. It seems, however, that shortly after the death of William Rex, his sister Sarah Rhoner, theretofore Sarah Karker (named in the will of her father Sarah Carager), by deed dated April 23d 1845, in consideration of natural love, of past support, and of $1, conveyed to her grandson, Jacob Karker, and his heirs, ' all her interest in and to the estate of her late brother, William Rex, deceased.'

" If this grantee can therefore successfully maintain his position that this deed passed not only the estate of William in his own right, but also in what is here called the remainder of Joseph's estate, or if, in other words, William died seised of a vested remainder in Joseph's estate, which passed to his sister Sarah amongst his other heirs, then this deed sweeps to the grandson all Sarah's distributive share, to the utter exclusion of her other descendants.

" To accomplish this result it is of course necessary for Mr. Karker to demonstrate that upon the death of the testator, John Rex—

" 1st. Some interest in Joseph's share instantly vested in William.

" 2d. That this interest in Joseph's share was an estate not liable to be defeated by Joseph's survivorship.

" If he can succeed in establishing these propositions, then it follows that instantly upon the death of John Rex, the foot of William was planted upon his brother Joseph's share, and that, although he died before Joseph, his heirs stood in his shoes; that Sarah Karker, as one of those heirs, was thereupon in like manner seised of an estate in Joseph's share which by her deed passed to her grandson, to the present exclusion of his own father, and all who would but for that deed inherit Joseph's share as the descendants of his sister Sarah.

"This statement of the relative positions of these different claimants brings us to the words of the will which is to decide between them.

"And here it should be remarked that none of the numerous cases with which the books abound can be declared to be an unerring guide to the true construction of this will. Like all other such instruments, it must, subject to the general rules upon this subject, be its own interpreter.

"Mr. Redfield has well expressed this thought in his valuable treatise on Wills, p. 423. He says: 'Precedents ought never to be allowed an arbitrary and unbending control of any case not precisely analogous—we might say not strictly identical. * * * We ought never to forget that mere analogies never rise above the character of assistants. We should not, therefore, allow ourselves to become slaves to them.'

"The same writer has also wisely told us that 'There is in the majority of cases an opportunity to adapt general rules of construction to the *particular circumstances* of each case as it arises. And when it is not found practicable to bring the cause to that result which the particular facts and circumstances seem to indicate as the most conformable to reason and justice, it is always to be feared that the comprehension and wisdom of the court fell short of the emergency in which they were placed.'

"To the same effect is the syllabus of Passmore *v.* Huggins, 25 Law J. Rep. N. S. Ch. 251, 21 Beav. 103. 'In the construction of wills the court will consider the intention of the testator, the state of the parties provided for, and to remove inconsistencies,' will change a word. Our Supreme Court have enunciated the same principle in Rewalt *v.* Ulrich, 11 Harris 388.

"In construing this will, let us look to the intention of the testator as illustrated by the state of the parties provided for, in order, as Mr. Redfield says, 'to bring the cause to that result which the particular facts and circumstances seem to indicate as the most conformable to reason and justice.'

"The will is here our only directory. It tells us that the testator remembered well, and, as far as we can judge, impartially, his wife and all his children. He does not appoint Joseph one of his executors, refers to him as then 'in a declining state of health,' and declares that 'IN CASE Joseph shall HAPPEN to die INTESTATE and without issue, then and in that *case* the testator bequeaths and devises all the real AND PERSONAL estate devised unto him, to William Rex' in fee, subject to the payment of 150*l.* each, 'to Jacob and John Rex.'

"It is clear, therefore, that the father thought his son Joseph might soon die. He does not say, that in the event of that death, all the estate bequeathed to Joseph shall pass to or belong to William; but seeming to regard it as probable that Joseph might

die before the testator, and desirous of being spared in such a contingency the trouble of drawing a new will, he uses the peculiar form of expression '*then and in that case I give*' the estate to William which I have heretofore devised to Joseph, and I direct William, whose share is thus increased, to pay 150*l.* to each of his brothers Jacob and John, in order, as we read the will, to readjust the division of the property.

"Does this mean that Joseph was to have but an estate tail, which without fine, recovery or bar, would be but a poor life estate to him? To give the will this construction we must strike out the words '*heirs and assigns for ever*' which have always been descriptive of a fee simple, and the word '*intestate*' which clearly recognised the already bestowed power of devising, and which is at utter war with the existence of an estate tail.

"Now, although it is very true that by numerous decisions in Pennsylvania the words 'shall happen to die without issue' have been construed to mean an indefinite failure of issue, and hence to cut down a fee simple to a fee tail, yet in no case that I have been able to find has this decision been applied to instruments expressly or impliedly conferring the power to devise. And this for the very simple reason that no court could call a man tenant *in tail* who had the power to devise a fee simple.

"A brief examination of the Pennsylvania authorities on this point will illustrate this position.

"In Clark *v.* Baker, 3 S. & R. 470 (1817), Theodorus Lord devised his plantation to his daughter and granddaughter, 'to hold to them and the survivor and their lawful issue for ever.' Then followed a cross-remainder to the survivor in default of lawful issue of the deceased, and if 'both should die without leaving lawful issue, then remainder to Daniel Williams.' This was held to give the daughter and granddaughter estates tail. It will be observed that there was no power of devise.

"It is true there was a power of sale, but C. J. Tilghman did not regard this as inconsistent with the estate tail, for he quotes from the will to show that this authority really gave no right to dispose of the corpus of the estate, as 'the principal had to be locked up for the benefit of the daughter and granddaughter and their issue indefinitely.'

"In Gause *v.* Wiley, 4 S. & R. 509 (1818), there was a devise to the testator's daughters, and if either of them should 'die without issue, then the inheritances to descend to the next elder.' This was in connection with the whole will construed to be an estate tail, but in no clause of the instrument was there an express or implied power of devising.

"The same remark is applicable to Eichelberger *v.* Barnetz, 17 S. & R. 293 (1828), where the limitation was in these words, 'if my grandson Abraham should die without issue, the part, as

10 P. F. SMITH—10

[Karker's Appeal.]

willed to him, is to fall to my heirs back, to be divided amongst my children.'

"In Caskey v. Brewer, in the same volume, p. 441, the clause cutting down the fee simple reads, 'if either of my said daughters should die without issue, then the share of said daughter shall vest in the other daughters,' &c.; but here again was no grant or recognition of a power to devise the estate.

"The other cases I have examined are Heffner v. Knepper, 6 Watts 18 (1837); Eichelberger v. Barnitz, 9 Id. 447 (1840); Langley v. Heald, 7 W. & S. 96 (1844); Vaughan v. Dickes, 8 Harris 509 (1853); Pierce v. Hakes, 11 Id. 231 (1854); Braden v. Cannon, 1 Grant 60 (1854); Ivins v. Scott, 2 Casey 215 (1856); Price v. Taylor, 4 Id. 96 (1857); Rancel v. Cresswell, 6 Id. 158 (1858); Criley v. Chamberlain, Id. 161 (1858); Doyle v. Mullady, 9 Id. 264 (1859); Kay v. Scates, 1 Wright 31 (1860); Wynn v. Story, 2 Id. 166 (1861); Barnet v. Deturk, 7 Id. 92 (1862); and Hagerty v. Albright, 2 P. F. Smith 274 (1866).

"Without encumbering this opinion with extracts from the wills construed in each of those cases, it is sufficient to say that in no one of them is there an express or implied power of general devise in the first taker.

"In Doyle v. Mullady, 9 Casey 264, and Wynn v. Story, 2 Wright 166, there was an attempted restriction on the power of disposition.

"In Barnet v. Deturk, 7 Wright 92, there was a proviso to the limitation over that if the son 'should sell the aforesaid property he may grant and assign it as he likes.' A sale was made by the devisee though for a nominal consideration, and his grantee immediately reconveyed.

"In a very able opinion by Woodward, P. J., this exercise of the power was held to divest the estate limited to the plaintiffs, and the Supreme Court, in a learned review of the law by Read, J., affirmed the judgment, declining, however, 'to examine into the exact nature of the estate that would have been vested' in the first taker if he had not made the conveyance referred to.

"Kay v. Scates, 1 Wright 31, may be regarded as overruled by Barnet's Appeal, 10 Id. 392, and Shankland's Appeal, 11 Id. 113, so far as it affirmed Kuhn v. Newman. With reference, however, to the point now before us for decision, Kay v. Scates is untouched by any later authority, and it has been therefore examined in connection with its kindred cases, which rule that the expression 'leaving no issue' indicates an indefinite failure of issue, and therefore reduces the fee simple to a fee tail.

"In Kay v. Scates there was a power of appointment, limited, however, 'to the issue' of the first takers, and that case is therefore no exception to the remark, already made, that no one of the testaments referred to in the decisions which favor Jacob Karker's

construction of this will contained a word which expressly or impliedly gave to the first taker the right of devising the estate.

"Let us then see whether the will of John Rex gave the power of· devising to Joseph Rex, and if it did, let us next inquire whether this distinction between it and the other cases referred to is or is not of importance in determining the true construction of the clause now in dispute.

"The will says: 'In case my said son Joseph, who is now in a declining state of health, shall happen to *dye* intestate and without issue, then and in that case' the real and personal estate is devised to William Rex, &c.

"It is therefore too clear to need argument that William could take nothing of Joseph's share unless Joseph died intestate and without issue. If Joseph left a will, the estate would of course pass to his devisees, and this must be regarded as a clear recognition of his right to devise the estate given to him in the preceding sentences. What then is the estate over which a man has the absolute power of general, uncontrolled, unlimited devise? Who can, with any regard to technical propriety, call such an estate a fee tail?

"Upon this point the case of Church v. Disbrow, 2 P. F. Smith 219, must be regarded as conclusive, not only because it is the last decision, but because the industry of the learned judge who delivered the opinion, and of the able counsel who argued the cause, have supplied us with perhaps every citation touching the question.

"Woodward, C. J., says: 'A devise of an estate generally or indefinitely, with a power of disposition over it, carries a fee.' It will be observed that there the devisee was only to hold the estate 'during her lifetime,' but she was also 'to dispose of the same as should seem best to her,' with a strong expression of the testator's wish that the devisee should leave the property for the benefit of a certain charity. She died without having made any deed or will; but our District Court and the Supreme Court ruled that she had taken a fee simple, and that the land descended to her heir at law.

"Here, then, in John Rex's will we find a fee simple in Joseph, with an express recognition of an uncontrolled power of devise. What shall happen in case of Joseph's intestacy, he being absolute owner, is for the law to declare. The testator could not say that although Joseph had the fee and the power to will, yet if he died intestate, the law should not take its course. This has been attempted, but the effort has been frustrated by the courts.

The case of Gulliver v. Vaux was an ejectment which raised the question of the proper construction of the will of Thomas Turney. It was decided in 1746, but, so far as I can ascertain, was not reported for upwards of a century after the judgment

had been entered.   In the argument of Holmes *v.* Godson, 8 De
Gex, McN. & G. Rep. 156 (1856), Mr. Lee, as *amicus curiæ*,
referred the court to this case, and the reporters deemed it of
sufficient importance to extract it from Mr. Justice Burnett's
MSS., and to publish it at p. 167, following the report of Holmes
*v.* Godson.   The language in Turney's will is almost identical
with the words we have been considering.   He says, 'in case it
shall so happen that all my three children shall depart this life
without leaving issue, &c., and *without appointing the disposal of
the same, then and in such case,* I give,' &c.

" The arguments there were directed to the same points as those
discussed at our bar.

" On the one side it was contended that the first takers had but
an estate tail, and that the words referring to the appointing power
might mean 'not having disposed thereof by fine or recovery.'
It was also urged, that at all events it was good as an executory
devise.   The defendant's counsel contended that it could not be
a remainder, because it came after a fee, and that as an execu-
tory devise it was too remote.

" Willes, L. C. J., was of opinion that the bequest was not good
as a remainder, but that it would hold as an executory devise.   In
which opinion Abney, J., concurred, but Burnett, J., differed from
his brethren upon ground not taken in the argument, to wit, that
this was 'a condition or contingency repugnant to the estate
devised, and must be void;' which he illustrated and supported
by a number of authorities.

" The advantages of a minority were well asserted in this case,
for the note-book adds, 'Afterwards, upon conference between us,
Willes, L. C. J., and Abney, J., changed their opinions, and
Willes, L. C. J, delivered the resolution of the court agreeable
to my opinion.'

" Holmes *v.* Godson, 8 De Gex, McN. & G. 153, arose upon the
will of Rev. Thomas Yates Ridley.   He devised certain real and
personal estate to his son, to vest upon attaining twenty-one years
of age, with a limitation over, 'in case my dear son shall not
live to attain the age of twenty-one years, or having attained the
age of twenty-one years, shall not have made a will.'

" Lord Justice Knight Bruce, after referring to the cases cited,
'not less than twelve,' decided that the words 'or having attain-
ed the age of twenty-one years, shall not have made a will,' were
of no force, and the son having attained his majority, it was held
that the estate had vested in him, and did not divest by his sub-
sequent death intestate.   This opinion was concurred in by Lord
Justice Turner, and the gift over was declared 'repugnant and
void.'   The will of Henry Naglee was twice before our Supreme
Court in Williams *v.* Leech, 4 Casey 89, and Naglee's Appeal, 9
Id. 89.   There after a devise in fee, came a clause restraining

the power of alienation, reducing the fee to a life estate, and declaring that after the death of the first taker the property should be equally divided among the children.   Yet it was decided that none of these clauses touched the fee.

"To the same effect are Reifsnyder v. Hunter, 7 Harris 41, and Walker v. Vincent, Id. 369.   Mary Biddle's Estate, 4 Casey 60, although decided upon a point which will be noticed hereafter, distinctly recognised the principle of the law which disregards limitations over inconsistent with the fee of the first taker.   It will also be observed that the power in Joseph of making a will is fatal to the executory devise, if such it is to be called, in favor of William:   Vide Jackson v. Robbins, 16 Johns. Rep. 585.   The two are pronounced by all the authorities as 'perfectly incompatible and repugnant to each other, *and the latter is to be rejected as void.*'

" It may be answered to all this that the word 'intestate,' in recognising a power to devise, confers no greater estate than had been previously given by the words 'heirs and assigns for ever;' that they clearly give an estate in fee simple; and that as every tenant in fee can devise, the word '*intestate*,' upon which so much stress has been laid, is after all but mere surplusage.

" But the moment the objector advances this argument, he moves into check.   For it should not be lost sight of in this discussion that Mr. Karker can only recover by cutting down the fee simple in Joseph to a fee tail.   When, therefore, he answers that the word 'intestate' is surplusage as applied to a fee simple, he instantly destroys his whole case.   If, therefore, the issue here is between a fee simple and a fee tail, the word 'intestate' gives its fiat to the discussion.

" It would seem, therefore, that the same word distinguishes this from the other limitations over in our books, and that the subsequent attempt of the testator to make a new law of intestacy has not been favored by the courts.

" There is another expression in this devise which should not be lost sight of.   The testator says, '*In case*' his son 'who is NOW in a declining state of health shall HAPPEN to *dye.*'

" Was he thinking, as he published these words, of a death which might overtake Joseph fifty-eight years thereafter ?   He must have known that properties in the neighborhood of large cities increase greatly in value with the efflux of time.   He could not foresee the rise which has taken place in the values of half a century past, but he may fairly be presumed to have had the usual understanding possessed by men of the most ordinary intelligence upon such a subject.   In the light of that reflection can it be supposed as within the range of possibility that this testator intended 300*l.* as the sum which should at any period of time,

however remote, equalize the devise over to William of a double share of the estate?

"Let us turn from conjecture to the definition which the law has applied to the words before us.

"Where personal estate is given to a person indefinitely or absolutely, 'and in case of his death' to another, this disposition, though apparently constituting a gift of a life interest with a *quasi* remainder, * * is, in the absence of all indications of a contrary intent, construed to amount to an hypothetical limitation of the absolute interest, to take effect *in the event of the person named as first taker surviving the testator*, with 'an alternative limitation over, to take effect in case of the death of the first taker IN THE LIFETIME OF THE TESTATOR, &c.: Smith on Executory Devises [338-9].

"And again, 'even where the gift over is not simply on the event of death,' but without issue, &c., the death will be construed not to mean a death generally, at some time or other, but in THE TESTATOR'S LIFETIME, &c.: Id. [347].

"The grounds of this rule, and the decisions which support it, are given at length by the learned author in the pages cited. Amongst other illustrations he puts the case: 'Thus a bequest to A. and *in case* of his death to B., is a gift absolute to *A.*, unless he die in the testator's lifetime.' He adds [351] that this construction is equally applicable to real estate, and he criticises at some length an opposite decision. See also Id. [344], [349], [352].

"In Clayton *v.* Lowe, 5 Barn. & Ald. 636, after a devise in fee to three grandchildren, the testator added that 'if either of them should happen to die without child or children lawfully begotten, then such part or share of the one so dying should be equally divided among the survivors.' It was held that upon the death of the testator the grandchildren took an *indefeasible* estate in fee simple.

"In Caldwell *v.* Skilton, 1 Harris 152, after a devise to children in fee, the testator added, '*in case* of the death of either of my said children, his or her share to descend to the children of said child, or if said child should die without issue born alive, then the said share to be divided among my surviving children.' These words are almost identical with those in the will of John Rex, but they recognised no power of devising.

".The point argued was, whether one of the devisees had an indefeasible estate in fee simple. Judge Burnside, in an opinion of three lines, decided against the limitation over. It was argued before the court in banc as here, that the expression 'in case of the death,' meant 'death *generally* or *whenever* it might happen;' but Bell, J., in delivering the opinion of the Supreme Court, says: 'I am satisfied, * * upon the authority of all the cases, that

by this phrase the testator did *not* mean death generally, but in the contingent sense of death occurring within a particular time,' &c.   He then reviews the English cases and quotes at length from Powell on Devises, ch. 37.   The sum of all the authorities there cited, when applied to the case now before us, requires us to rule that John Rex 'referred *to the death of his devisee in the lifetime of the testator.*'   The case of Caldwell *v.* Skilton was followed by the decision in Mary Biddle's Estate, 4 Casey 60, in which, after a devise in fee embracing both realty and personalty, the testatrix added limitations over 'in the event of her daughter's death without children.'   This court ruled that the devisee took but an estate for life, but the Supreme Court reversed, and decreed the estate to the devisee *in her absolute right.*   Lowrie, J., says: 'The subsequent dispositions were intended to take effect if Anne should die before her mother.'

"The next year Vice-Chancellor Wood decided the same way in Schenck *v.* Agnew, 4 Kay & Johnson's Ch. Rep. 405.   In that case, after a bequest in fee, the testator added, 'and in the event of her death then to her youngest surviving son.'   The old argument was repeated that this meant 'death generally,' but the Vice-Chancellor said : 'He had looked into the authorities, and had come to the conclusion that * * the plaintiff was entitled * * absolutely; the gift to her youngest son being a substantial gift intended to take effect *in the lifetime of the testator.*'   He added that there was but one case, Lord Douglass *v.* Chalmer, which appeared at all to stand in the way, but of that case he significantly said that '*it appeared never to be cited except for the purpose of being distinguished.*'   Hagerty *v.* Albright, 2 P. F. Smith 274, so far as the decision touches this question, is in recognition of the principle thus authoritatively established.

"But again we find this testator blending his personal and real estate.   It is 'the *real and personal* estate willed, bequeathed and devised unto' Joseph, which is to go over to William.

"That there can be no estates tail in chattels is too well settled to require argument, illustration or citation.   The rule upon this subject, the reasons therefor, and the authorities which go to the extremest length, may all be found in Smith on Executory Devises [307] *et seq.*

"In holding that Joseph took an absolute fee simple, and that the limitation over was substitutional, intended only to apply to the contingency of Joseph's death in the lifetime of his father, we are but administering those favorite principles of the law which require us in doubtful cases to regard the first taker as the principal subject of the testator's bounty, which favor the free alienation of estates, and which wisely hold the broadest equality to be the purest equity.

"If the views herein suggested have any foundation in law or

logic, it would follow that the word intestate is the destruction of both the opposing theories upon which Mr. Karker's claim is founded, that even if it were otherwise, the limitation is void, and that at all events it never was intended to apply to a case wherein the first taker, as here, survived the testator. And if it should be answered that this is all mere technicality and refinement, may it not be fairly replied that Mr. Karker's claim is itself founded upon the subtlest of all reasoning, for he would introduce here a jargon of limitations over, indefinite failures of issue and fees tail, of which this good testator had probably never heard or even dreamed, and the slightest intimation of which would have driven him to a cold intestacy. It is meet, therefore, that this claimant should be defeated with his own weapons, for it is written '*Nec lex est œquior ulla, quam necis artifices arte perire sua.*'

"Other points might be suggested, and other cases might be cited in support of the foregoing views. But they would only encumber an opinion already too long extended. We have been induced to go over the case, and to consider it at this length only in deference to the ability with which these exceptions were argued upon both sides, and in order to meet and answer every possible view which could be suggested against the construction herein intimated as proper to be applied to this will. It is due to the learned auditor to say, that many of the cases herein referred to were not cited before him.

"Considering all that we have heard and examined, we believe that the learned auditor erred in his conclusions, and therefore the

"Exceptions to the report are sustained."

From this decree Jacob Karker appealed to the Supreme Court.

*D. W. Sellers* and *Geo. W. Thorne*, for appellant, argued:—

1. That although Joseph knew that if he died without a will his share would go to William, he yet lived thirty-five years without making a will.

2. That the devise of the fee to Joseph was cut down to an estate tail by the limitation over; that there was no case against this view in Pennsylvania: Wynn *v.* Story, 2 Wright 166.

3. That the words "die intestate" gave by implication a power to appoint. But if the power were never executed it went for nought: Second Reformed Church *v.* Disbrow, 2 P. F. Smith 219.

4. That the intent of the testator was to govern unless inconsistent with some acknowledged rule of law. We are bound to presume the testator used these words in the sense in which they had been construed by the courts.

5. To 'die without issue" means without issue at the time of his death, and is definite: Beachcroft *v.* Broome, 4 T. R. 441; Fearne on Rem. 366, 551. Hence this is an executory devise,

and the report is correct, though we may differ as to the reasons given.

6. There is no blending of the realty and personalty.

The intent governs if not contrary to law: Findlay *v.* Riddle, 3 Binn. 149: Zimmerman *v.* Anders, 6 Wend. 219; Johnson *v.* Morton, 10 Barr 247. Devisor before 1833 could not pass lands not vested in him: Girard *v.* City, 2 Wall. 301; Gable *v.* Daub, 4 Wright 217. Under a power of appointment by will the appointee takes under the will: Goodill *v.* Brigham, 1 Bos. & P. 192; Maundrell *v.* Maundrell, 10 Ves. 246; Roach *v.* Wadham, 6 East 289; Ray *v.* Pung, 5 Mad. 310; s. c. 5 B. & Ald. 561; Cleere's Case, 6 Rep. 176 b; Tickner *v.* Tickner (cited in Parsons *v.* Freeman, 3 Atk. 742); Logan *v.* Bell, 1 Man. Gr. & S. 884. The testator had a right to give to the tenant in tail power over the fee: Clark *v.* Baker, 3 S. & R. 470. The following cases construe a case like that in hand: Gause *v.* Wiley, 4 S. & R. 509; Hoffner *v.* Knepper, 6 Watts 18; Eichelberger *v.* Barnitz, 9 Id. 447; Vaughan *v.* Dickes, 8 Harris 509; Doyle *v.* Mullady, 9 Casey 264; Matlack *v.* Roberts, 4 P. F. Smith 148. William took a fee simple as an executory devise: Barnett *v.* De Turk, 7 Wright 92; Langley *v.* Heald, 7 W. & S. 96; Jessup *v.* Smuck, 4 Harris 327; Gurnall *v.* Wood, Willes 211; Ivins *v.* Scott, 2 Casey 215; Curran *v.* McMeen, 5 P. F. Smith 487; Nicholson *v.* Bettle, 7 Id. 384.

*Wm. C. Hannis*, for appellee, contended:—

1st. That the limitation over was on definite failure of issue: Fulton *v.* Fulton, 2 Grant 28; Johnson *v.* Morton, 10 Barr 248; Biddle's Estate, 4 Casey 59.

2d. The real and personal estate were blended.

3d. That the time during which the death of Joseph was to vest the estate in William was expressly or impliedly limited to the lifetime of the testator, or, at all events, the lifetime of William: Caldwell *v.* Skilton, 1 Harris 155; Eichelberger *v.* Barnetz, 17 S. & R. 293; Eby *v.* Eby, 5 Barr 461; Langley *v.* Heald, 7 W. & S. 96; Johnston *v.* Currin, 10 Barr 500; Hagerty *v.* Albright, 2 P. F. Smith 276; Duval's Appeal, 2 Wright 112; Jessup *v.* Smuck, 4 Harris 327.

4th. That the words "die intestate" implied a power to dispose by will inapplicable to an estate tail. A man may have a life estate with power of appointment but not of devise: Johnson *v.* Morton, 10 Barr 248.

5th. That William could not take a remainder, for that cannot be limited after a fee: Church *v.* Disbrow, 2 P. F. Smith 219; Jackson *v.* Robbins, 16 Johns. 585. The words "die intestate" are also fatal to the limitation over, treating it as an executory devise.

[Karker's Appeal.]

"In case" denotes a contingency: Smith on Executory Interests 339. Words may be changed, &c., when the context requires it: Abbott *v.* Middleton, 21 Beav. I43; Redfield on Wills 453; Passmore *v.* Huggins, 21 Beav. 108; Rewalt *v.* Ulrich, 11 Harris 388; Matlack *v.* Roberts, 4 P. F. Smith 148. The limitation over of the personalty and realty by the same words show that the same estate in each was intended: Morrison *v.* Semple, 6 Binn. 98; Steele *v.* Thompson, 14 S. & R. 101. The dying intended was in the lifetime of the testator: 2 Powell on Devises 763–765; Rapp *v.* Rapp, 6 Barr 49; 1 Roper on Legacies 400; 2 Id. 1551; Ross *v.* Drake, 1 Wright 376; Schenck *v.* Agnew, 4 Kay & Johns. Ch. R. 405. An estate tail is not within the intestate laws: Goodright *v.* Morning Star, 1 Yeates 313; Jenks *v.* Backhouse, 1 Binn. 96; Guthrie's Appeal, 1 Wright 10; Van Rensselaer *v.* Dunkin, 12 Harris 252. The limitation to William is void: Barnett *v.* Deturk, 7 Wright 92; McDonald *v.* Walgrave, 1 Sandf. Ch. R. 274; Hill *v.* Hill, 4 Barb. 419; Ramsdell *v.* Ramsdell, 8 Shepley 288; Melson *v.* Cooper, 4 Leigh R. 408; Stroud *v.* Morrow, 7 Jones Law R. 463; Ide *v.* Ide, 5 Mass. 500; Helmer *v.* Shoemaker, 22 Wend. 137; McLean *v.* McDonald, 2 Barb. 534; Levin *v.* Brown, 2 Swan. 112; Williams *v.* Jones, Id. 620; Purcell *v.* Wilson, 4 Grat. 16; Hughes *v.* Ellis, 20 Beav. 193; Holmes *v.* Godson, 8 De Gex, M. & G. 152; Gulliver *v.* Vaux, Id. 167.

*R. M. Logan,* for other exceptants, withdrew their exceptions.

The opinion of the court was delivered, February 16th 1869, by READ, J.—This case has been discussed at great length in the court below, on the original report of the auditor, and in the very learned opinion of Judge Brewster overruling the auditor. This makes it unnecessary to enter into a detailed examination of the numerous authorities cited by the counsel on both sides. John Rex, by his will, devised two tracts of land to his son, Joseph Rex, his heirs and assigns for ever, which was followed by this clause: "Item. All the rest and residue of my personal property, of every description, not hereinbefore willed and bequeathed, I give and bequeath unto my sons, William and Joseph Rex, share and share alike, and to their heirs and assigns for ever." The estates thus given to Joseph Rex were absolute and unqualified, and both species of property are placed on the same footing. Then comes the clause which occasions the present dispute: "Item. In case my said son Joseph, who is now in a declining state of health, shall happen *to dye intestate* and without issue, then, and in that case, I give, bequeath and devise the estate, real and personal, willed, bequeathed and devised unto him, to my son, the said William Rex, and to his heirs and assigns for ever,

subject to the payment of one hundred and fifty pounds to each of my other sons, the said Jacob and John Rex, or to their respective heirs and assigns."

The testator died in 1802. William Rex died in March 1845. Joseph Rex remained in possession of the land devised to him until his death in 1859. Both brothers died intestate, unmarried and without issue.

It is unnecessary to consider whether the language used indicated a definite failure of issue, either in the lifetime of the testator or of William, because the words "*shall happen to die intestate*" negative entirely the idea that the clause gives only an estate tail to Joseph, with remainder to William. There is first an unqualified gift or devise in fee simple, and then a condition entirely repugnant to this estate upon which this is to go over to William. The result of the authorities is succinctly stated by Jarman on Wills, vol. 2, p. 15, thus: "A power of alienation is necessarily and inseparably incidental to an estate in fee. If, therefore, lands be devised to A. and his heirs upon condition that he shall not alien or charge them with any annuity, the condition is void. And in like manner, a condition or conditional limitation annexed to a devise in fee, purporting to give the property over in case the devisee shall die intestate, or shall not part with the property in his lifetime, is repugnant and void; since, in the first case, it would not only defeat the rule of law, which says that upon the death intestate of an owner in fee simple, his property shall go to his heirs at law, but also deprive him of the power of alienation by act *inter vivos*, and in the second case it would take away the testamentary power from an owner in fee."

And the same author, in the same volume, page 19, says, "It is clear, therefore, that if a legacy were given to a person, his executors, administrators and assigns, an injunction not to dispose of it, though followed by a limitation over in case of non-compliance, the restriction would be void, and a gift over, in case of the legatee dying without making any disposition, would be also rejected as a qualification repugnant to the preceding absolute gift." The same doctrine is stated by Justice Williams, in the second volume of his treatise on "The Law of Executors and Administrators," p. 176. The principles thus stated are supported by all the English and American cases cited in the argument, to which may be added Annin's Executors *v.* Vandoren's Administrator, 1 McCarter Ch. R. (N. J.) p. 135, decided by Chancellor Green.

Agreeing therefore with the court below, the decree is affirmed at the costs of the appellant.

Decree affirmed.